## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MARYLAND

| | |
|---|---|
| **DORIS and BOB LAVINE, AARON JANIK, AND KELLEY WOMACK,** on behalf of themselves and all others similarly situated, | |
| Plaintiff, | Case No. _____ |
| v. | |
| **MARRIOTT INTERNATIONAL, INC., and STARWOOD HOTELS & RESORTS WORLDWIDE, LLC,** | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Doris and Bob Lavine, Aaron Janik, and Kelley Womack (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, respectfully file this Class Action Complaint ("Complaint") against Defendants Marriott International Inc., and Starwood Hotels & Resorts Worldwide, LLC (collectively "Marriott" or "Defendants"), and allege the following:

## NATURE OF THE ACTION

1.      This class action seeks to redress Marriott's unlawful and negligent disclosure of millions of consumers' confidential personal identifying information ("PII"), including their names, addresses, passport details, phone numbers, email addresses, dates of birth, gender, and credit card numbers with expiration dates in violation of the Maryland Consumer Protection Act, Maryland Code Ann., Com. Law § 13-101 *et seq.* ("MCPA"), the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. § 530/1, *et seq.* ("IPIPA"), the Illinois Consumer Fraud and

Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/1, *et seq.* ("ICFA"), the California Unfair Competition Law, Cal. Business & Professions Code § 17200, *et seq.*, ("CUCL"), the California Customer Records Act, Cal. Civ. Code § 1798.80, *et seq.* ("CCRA"), the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750-1785 (the "CLRA"), the consumer protection laws of states with materially identical terms, and common law.

2.      Marriott failed to fulfill its promises to its customers and its legal duty to protect consumers' PII which was stored in its systems.  Marriott's willful, reckless, and negligent disregard for its obligations to safeguard individuals' PII resulted in a massive data breach that has been occurring since at least 2014, exposing hundreds of millions of consumers' PII ("Data Breach" or "Breach").

3.      Plaintiffs brings this action on behalf all persons who reside in the United States whose PII was compromised as a result of the Data Breach; Plaintiffs Lavine also bring this action on behalf of all persons who reside in Maryland whose PII was compromised as a result of the Data Breach; Plaintiff Janik also brings this action on behalf of all persons who reside in Illinois whose PII was compromised as a result of the Data Breach; Plaintiff Womack also brings this action on behalf of all persons who reside in California whose PII was compromised as a result of the Data Breach; and Plaintiffs also bring this action on behalf of all persons who reside in states with materially identical consumer protection laws whose PII was compromised as a result of the Data Breach (the "Classes" or "Class Members").

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) ("CAFA") because (a) there are 100 or more Class Members, (b) at least one

Class Member is a citizen of a state that is diverse from Marriott's citizenship, and (c) the matter in controversy exceeds $5 million, exclusive of interest and costs.

5.    This Court has personal jurisdiction over Marriott because it is a corporation headquartered and doing business in the state.

6.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including decisions by Marriott's executives that lead to this Data Breach.

## PARTIES

7.    Plaintiffs Doris and Bob Lavine are residents of Rockville, Maryland and are long-standing members of the Starwood Preferred Guest program.  The Lavines have made reservations directly through the Starwood reservation system for the Sheraton Commander Hotel in Cambridge Massachusetts multiple times between August 2011 and August 2013. They also made reservations through a Tauch Tour at the Sheraton Stockholm Hotel in Stockholm, Sweden in August 2017.

8.    Plaintiff Aaron Janik is a resident of Mokena, Illinois.  Mr. Janik is a member of Marriott's Starwood Preferred Guest program and has made reservations and stayed at Defendants' hotels and lodging properties multiple times in the United States and abroad since 2015, including at the Starwood-branded Sheraton Grand Los Cabos Hacienda del Mar in San Lucas, Mexico in January of 2015 and the Grand Sheraton in Chicago, Illinois in November of 2016.

9.    Plaintiff Kelley Womack is a resident of Highland, California.  Ms. Womack is a member of Marriot's Starwood Preferred Guest program and has made reservations and stayed at Defendants' hotels and lodging properties multiple times in the United States since 2015, including at the The Westin Dallas Fort Worth Airport in Irving, Texas in July 2015, the

Aloft Phoenix-Airport in Phoenix, Arizona in October 2015, and the Avenue of the Arts Hotel in

Costa Mesa, California in June 2017.  Plaintiff Womack has, and/or will continue to, sustain

economic damages, including signing up for Lifelock's $9.99 program to attempt to mitigate the

harms of the Data Breach, as well as placing credit freezes on her accounts with the credit

unions.  Plaintiff Womack has spent and will continue to spend time and/or money addressing

the Data Breach, by reviewing her accounts, credit reports, and taking other actions to attempt to

mitigate the harm resulting from the Data Breach.

10.     Defendant Marriott International, Inc. is incorporated under the laws of the State of

Delaware, with its principal place of business in Bethesda, Maryland.  Marriott operates through

various subsidiaries, including Starwood Hotels & Resorts Worldwide, LLC, each of which acts

as an agent of or in concert with Marriott.

11.     Defendant Starwood Hotels & Resorts Worldwide, LLC is incorporated under the

laws of the State of Maryland, with its principal place of business in Bethesda, Maryland.

<u>FACTS</u>

I.     **The Marriott Data Breach**

12.     Marriott is the largest hotel chain in the world, with more than 6,500 properties

located in 127 countries and territories globally, totaling over 1.2 million rooms.  In November

2015, Marriott announced that it was purchasing Starwood for $13.6 billion.[1]  Marriott owns and

operates a variety of hotel, lodging, and hospitality brands, including hotels under its Starwood

brands, which include W Hotels, St. Regis, Sheraton Hotels & Resorts, Westin Hotels & Resorts,

---

[1] *See* Amie Tsang & Adam Stariano, "Marriott Breach Exposes Data of Up to 500 Million
Guests."  NEW YORK TIMES, *available at*
https://www.nytimes.com/2018/11/30/business/marriott-data-breach.html (last accessed Nov. 30,
2018)

Element Hotels, Aloft Hotels, The Luxury Collection, Tribute Portfolio, Le Méridien Hotels & Resorts, Four Points by Sheraton, and Design Hotels.  Hundreds of millions of customers have made reservations and stayed at Starwood properties around the globe.

13.    When booking reservations and staying at a Marriott property, including its Starwood brand properties, customers provide Marriott with sensitive PII, including their names, addresses, passport numbers and details, phone numbers, email addresses, dates of birth, gender, and credit card numbers with expiration dates.

14.    Booking hotel reservations, and thus, collecting the PII of its customers, is therefore at the heart of Marriott's business.

15.    Moreover, individuals who entrust Marriott with PII, which includes extremely sensitive data such as passport details and credit card information, do so with the understanding that Marriott will safeguard that information.  That expectation is directly reinforced by Marriott, which publicly touts its commitment to safeguarding customers PII, including for example in its Marriott Group Global Privacy Statement, where it purports to "use reasonable organizational, technical and administrative measures to protect Personal Data."[2]  Likewise, Defendants' Marriott U.S. Privacy Shield Guest Privacy Policy represents to customers that it will "use reasonable physical, electronic, and administrative safeguards to protect your Personal Data from loss, misuse and unauthorized access, disclosure, alteration and destruction."[3]

16.    Despite these promises that it is committed to safeguarding guests' PII, in a November 30, 2018 statement, Marriott revealed that data for approximately 500 million guests was exposed in a hack that has allowed unauthorized access to its Starwood Hotels reservation

---

[2] *See* https://www.marriott.com/about/privacy.mi (last accessed Nov. 30, 2018).

[3] *See* https://www.marriott.com/about/global-privacy.mi (last accessed Nov. 30, 2018).

database since 2014, and that hackers have actively copied and encrypted information from this database.[4]

17.     According to Marriott's statement on September 8, 2018, Marriott received an alert from an internal system that there was an attempt to access the Starwood guest reservation database.[5]  Upon notification, Marriott began investigating and learned that unauthorized users had gained access to the Starwood network since 2014.[6]

18.     The statement further revealed that Defendant initially discovered the Data Breach months earlier, on September 8, 2018.[7]

19.     Such a delay is damaging to the Data Breach's victims, in that they could have immediately acted in a manner to protect themselves and their PII from further harm.

20.     The Data Breach compromised "some combination of name, mailing address, phone number, email address, passport number, Starwood Preferred Guest ("SPG") account information, date of birth, gender, arrival and departure information, reservation date, and communication preferences" for at least 327 million individuals, and names, mailing addresses and unidentified "other information" for at least 150 million other individuals.[8]

---

[4] *See Marriott Announces Starwood Guest Reservation Database Security Incident*, MARRIOTT NEWS CENTER (Nov. 30, 2018), http://news.marriott.com/2018/11/marriott-announces-starwood-guest-reservation-database-security-incident/ (last accessed Nov. 30, 2018).

[5] *See id*.

[6] *See id.*

[7] *See id.*

[8] *See id.*

21.     As Marriott's President and Chief Executive Officer Arne Sorenson has admitted, "[Marriott] fell short of what our guests deserve and what we expect of ourselves" in allowing this Data Breach to occur.[9]

## II.     Data Breaches Lead To Identity Theft.

22.     Data thieves intentionally hack into inadequately protected servers to steal PII with the primary incentive of weaponizing that private data to commit identity theft and financial fraud. Identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.

23.     According to Richard Gold, who is the head of security engineering at the cybersecurity firm Digital Shadows, "hotels are an attractive target for hackers because they hold a lot of sensitive information, including credit card and passport details, but often don't have security standards as tough as those of more regulated industries, like banking."[10]

24.     Given the scope of this Data Breach and the nature of the PII compromised, the ways in which criminals may unlawfully use the data is limitless, as is the timeframe for using the information for criminal endeavors.

25.     Unfortunately for Plaintiffs and the Classes, a person whose PII has been compromised may not fully experience the effects of the Data Breach for years to come:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[9] *See id.*

[10] *See* Amie Tsang & Adam Stariano, "Marriott Breach Exposes Data of Up to 500 Million Guests."  NEW YORK TIMES, *available at* https://www.nytimes.com/2018/11/30/business/marriott-data-breach.html (last accessed Nov. 30, 2018)

As a result, studies that attempt to measure the harm resulting from
data breaches cannot necessarily rule out all future harm.[11]

26.     The information implicated in the instant Data Breach is particularly susceptible to

delay tactics in that an individual's name, address, and passport number are not easily changed to

mitigate risk over time.  Accordingly, Plaintiffs and the Class Members will bear a heightened risk

of identity theft or fraud for the unforeseeable future.

27.     Given the fact that passport numbers were involved and the Data Breach included

international travel, Defendants' disclosure of Plaintiffs and Class Members PII will likely

constitute violations of the EU General Data Protection Regulations implemented on May 25, 2018

to provide data protection and privacy for all individuals within the European Union and the

European Economic Area.

28.     Identity theft occurs when an individual's PII is used without his or her permission

to commit fraud or other crimes.[12]

29.     According to the Federal Trade Commission ("FTC"), "the range of privacy-related

harms is more expansive than economic or physical harm or unwarranted intrusions and that any

privacy framework should recognize additional harms that might arise from unanticipated uses of

data."[13]

30.     On December 4, 2018, the FTC released a statement advising all Starwood and

Marriott victims to take action in response to the Data Breach, in part, because Defendants failed

---

[11] G.A.O., PERSONAL INFORMATION:  DATA BREACHES ARE FREQUENT, BUT EVIDENCE OF
RESULTING IDENTITY THEFT IS LIMITED; HOWEVER, THE FULL EXTENT IS UNKNOWN (June
2007), http://www.gao.gov/assets/270/262904.html.

[12] See FEDERAL TRADE COMMISSION: TAKING CHARGE: WHAT TO DO IF YOUR IDENTITY IS STOLEN
(April 2013), https://www.consuer.ftc.gov/articles/pdf-0009-taking-charge.pdf.

[13] FED. TRADE COMM'N, PROTECTING CONSUMER PRIVACY IN AN ERA OF RAPID CHANGE (March
2012), http://www.ftc.gov/os/2012/03/120326privacyreport.pdf.

to properly warn Plaintiffs and Class Members of harms that stem from the Data Breach.  In its

statement, the FTC provided the following warnings:

> Marriott International says that a breach of its Starwood guest reservation database exposed the personal information of up to 500 million people. If your information was exposed, there are steps you can take to help guard against its misuse.
>
> According to Marriott, the hackers accessed people's names, addresses, phone numbers, email addresses, passport numbers, dates of birth, gender, Starwood loyalty program account information, and reservation information. For some, they also stole payment card numbers and expiration dates. Marriott says the payment card numbers were encrypted, but it does not yet know if the hackers also stole the information needed to decrypt them.
>
> The hotel chain says the breach began in 2014 and anyone who made a reservation at a Starwood property on or before September 10, 2018 could be affected. Starwood brands include W Hotels, St. Regis, Sheraton Hotels & Resorts, Westin Hotels & Resorts, Le Méridien Hotels & Resorts, and other hotel and timeshare properties.
>
> The company set up an informational website, https://answers.kroll.com, and a call center, 877-273-9481, to answer questions. It says affected customers also can sign up for a year of free services that will monitor websites that criminals use to share people's personal information. Marriott says the service will alert customers if their information shows up on the websites, and will also include fraud loss reimbursement and other services.
>
> If your information was exposed, take advantage of the free monitoring service, and consider taking these additional steps:
>
> • Check your credit reports from Equifax, Experian, and TransUnion — for free — by visiting annualcreditreport.com. Accounts or activity that you don't recognize could signal identity theft. Visit IdentityTheft.gov to find out what to do.
> • Review your payment card statements carefully. Look for credit or debit card charges you don't recognize. If you find fraudulent charges, contact your credit card company or bank right away, report the fraud, and request a new payment card number.

- Place a fraud alert on your credit files. A fraud alert warns creditors that you may be an identity theft victim and that they should verify that anyone seeking credit in your name really is you. A fraud alert is free and lasts a year.
- Consider placing a free credit freeze on your credit reports. A credit freeze makes it harder for someone to open a new account in your name. Keep in mind that it won't stop a thief from making charges to your existing accounts.

Marriott says it will send some customers emails with a link to its informational website. Often, phishing scammers try to take advantage of situations like this. They pose as legitimate companies and send emails with links to fake websites to try to trick people into sharing their personal information. Marriott says its email will not have any attachments or request any information. Still, the safest bet is to access the informational website by typing in the address, https://answers.kroll.com.

To learn more about protecting yourself after a data breach, visit IdentityTheft.gov/databreach.[14]

31.     As a direct and proximate result of Marriott's reckless and negligent actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs and Class Members' PII, Plaintiffs and the Classes are susceptible to identity theft.

32.     The risks associated with identity theft are serious. Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, banking or finance fraud, and government fraud. "While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit."[15]

---

[14] THE MARRIOTT DATA BREACH, https://www.consumer.ftc.gov/blog/2018/12/marriott-data-breach (visited December 7, 2018).

[15] TRUE IDENTITY PROTECTION: IDENTITY THEFT OVERVIEW, http://www.idwatchdog.com/tikia//pdfs/Identity-Theft-Overview.pdf (visited Sept. 23, 2016).

33.     Having obtained the Plaintiffs and Class Members' names, addresses, passport details, phone numbers, email addresses, dates of birth, gender, and credit card numbers and expiration dates, cybercriminals can simply use the data revealed or pair the data with other available information to commit a broad range of fraud in a victim's name, including but not limited to:

- obtaining employment;

- obtaining a loan;

- applying for credit cards or spending money;

- filing fraudulent tax returns;

- obtaining medical care and filing prescriptions;

- stealing Social Security and other government benefits; and

- applying for a driver's license, birth certificate, or other public documents.

34.     Passport data was also included in the breach.  Passports are the most powerful and important travel documents in the world.

35.     Having obtained the Plaintiffs and Class Members' passports, cybercriminals can use the data to commit a broad range of fraud in a victim's name, including opening bank and other financial accounts, and illegally entering countries for the purpose of committing crimes or evading capture from past crimes by masking their identity from the authorities and stealing the identity of the true passport holder.[16]Passport numbers are useful to people who seek to steal identities and create fraudulent passports.[17] Passport numbers are generally only changed every

---

[16] Gabriel Wood, *Common Forms of ID Criminal Use to Commit Identity Theft, available at* https://www.nextadvisor.com/blog/common-forms-of-id-criminals-use-to-commit-identity-theft/

[17] *See* https:blog.credit.com/2014/05/numbers-identity-thieves-want-83924/ (visited Nov. 30, 2018).

ten years when they expire, making them valuable to hackers and thieves for a longer period of time.

36.     According to a senior expert with Gartner Inc. the theft of one's passport information is particularly devastating because "[i]f you're signing up for a new loan, if you're renting a car in a foreign country, if you're opening a bank account – you always have to present identity documents" like a passport.[18]

37.     A website devoted to protecting against identity theft states "[i]n the long run, a passport can prove to be a more serious matter than having your driver's license stolen. When this important document falls prey to a malicious individual, there is a great chance that it will be used to commit identity theft."[19]

38.     Plaintiffs are also at risk for having their Starwood Preferred Guest loyalty reward points stolen.  A thief may easily redeem reward points of a guest for airline miles, gift cards or physical goods from the program's shopping portal.  Additionally, a thief can redeem points for hotel stays or flights and cancel them in exchange for a gift card. Marriott is not legally obligated to make defrauded guests whole for their stolen reward points, the way a credit card company would be.[20]

39.     Beyond using the data exposed for nefarious purposes themselves, the cybercriminals who obtained Plaintiffs and Class Members' PII may also exploit the data by selling it on the "black market" or "dark market" for years following a breach.

---

[18] *See* https://spamlaws.com/passport-identity-theft.html (last visited Nov. 30, 2018).

[19] *See id.*

[20] *See* https://www.bloomberg.com/news/articles/2018-11-30/all-those-starwood-points-you-racked-up-at-risk-in-marriott-hack (visited Nov. 30, 2018).

40.     Indeed, there is a well-established international black market where hackers may quickly and efficiently sell -- in part or in whole -- precisely the type of PII stolen in the instant Data Breach.

41.     Moreover, much like regular online marketplaces (such as eBay), many dark market websites (such as AlphaBay) include feedback systems for vendors, refund policies, and easily navigable search categories.[21]

42.     The PII exposed in the Data Breach, which included, *inter alia*, names, birth dates, addresses, and passport numbers, qualifies as what hackers and black markets term as "fullz" records.[22]   According to one 2015 estimate, the median price for someone's identity on the black market is approximately $21.35.[23]   Fullz records are notably on the higher end of the pricing spectrum because they entail a "full set" of individuals' PII and the range of PII sold in the same markets also includes less glamorous information, such as basic credit card information.

43.     Cybercriminals can further post stolen PII on the internet, thereby making such information publically available.

---

[21] Keith Collins, *Here's what your stolen identity goes for on the internet's black market*, QUARTZ, July 23, 2015, https://qz.com/460482/heres-what-your-stolen-identity-goes-for-on-the-internets-black-market/.

[22] Brian Feldman, *So What Happens With All That Equifax Data?*, N.Y. MAGAZINE, Sept. 8, 2017, http://nymag.com/selectall/2017/09/so-what-happens-with-all-that-equifax-data.html.

[23] Keith Collins, *Here's what your stolen identity goes for on the internet's black market*, QUARTZ, July 23, 2015, https://qz.com/460482/heres-what-your-stolen-identity-goes-for-on-the-internets-black-market/.

44.     Moreover, individuals whose PII is subject to a reported security breach -- such as the Data Breach at issue here -- are approximately 9.5 times more likely than the general public to suffer identity fraud or identity theft.[24]

### III.     Marriott Was On Notice Of The Risks Of Cybersecurity Attacks.

45.     Marriott was well aware of the risk of cybersecurity attacks and data breaches.

46.     Data security breaches -- and data security breach litigation -- dominated the headlines in recent years, including into 2018.[25]  According to the Privacy Rights Clearinghouse Chronology of Data Breaches, over 1,300 breaches were publicly reported in 2017 and 2018 alone.[26]

47.     The hospitality industry has become a main target of cyber-attacks.  Many other hospitality chains have had major PII breaches.  Since the hospitality industry has become a target for attackers, Marriott was clearly aware of this threat.[27]

---

[24] See Javelin Strategy & Research, *Identity Fraud Industry Report: Social Media and Mobile Forming the New Fraud Frontier*, *available at* https://www.javelinstrategy.com/news/1314/92/1 (last visited Jun. 16, 2014).

[25] *See e.g.*, Seth Fiegerman, *Yahoo Says 500 Million Accounts Stolen*, CNN Tech (Sept. 23, 2016), http://money.cnn.com/2016/09/22/technology/yahoo-data-breach/; Sara Ashley O'Brien, *Giant Equifax Data Breach: 143 Million People Could Be Affected*, CNN Tech (Sept. 8, 2017), https://money.cnn.com/2017/09/07/technology/business/equifax-data-breach/index.html; Jim Finkel and David Henry, *Saks, Lord & Taylor Hit By Payment Card Data Breach*, Reuters (Apr. 3, 2018), https://www.reuters.com/article/legal-us-hudson-s-bay-databreach/saks-lord-taylor-hit-by-payment-card-data-breach-idUSKCN1H91W7; Bill Hutchinson, *87 million Facebook Users To Find Out If Their Personal Data Was Breached*, ABC News (Apr. 9, 2018), https://abcnews.go.com/US/87-million-facebook-users-find-personal-data-breached/story?id=54334187.

[26] *See* Privacy Rights Clearinghouse Chronology of Breaches *available at* http://www.privacyrights.org.

[27] See Hospitality Technology, *Cybersecurity Tactics for a Hotel Industry that's Under Sieg*e, *available at* https://hospitalitytech.com/cybersecurity-tactics-hotel-industry-thats-under-siege (last visited Nov. 30, 2018).

48.     For instance, in its SEC filings, Marriott stated that "[o]ur reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access or prevent authorized access to such systems have greatly increased in recent years."[28]

49.     Furthermore, this is not the first time the company has faced a data breach.  Rather, Marriott -- specifically at its Starwood properties -- has acknowledged or been implicated in previous data breach in 2016.[29]

**IV.     Plaintiffs And Class Members Suffered Damages As A Result Of The Data Breach.**

50.     The Data Breach was a direct and proximate result of Marriott's failure to properly safeguard and protect Plaintiffs and Class Members' PII against reasonably foreseeable threats to the security or integrity of such information.

51.     Marriott failed to identify, implement, maintain, and monitor appropriate data security measures, policies, procedures, controls, protocols, and software and hardware systems to ensure the security of Plaintiffs and Class Members' PII.

52.     Additionally, Plaintiffs and Class Members' PII was improperly handled, stored, segregated, and in some cases, either unencrypted or improperly partially encrypted, inadequately protected, readily able to be copied by data thieves, and not kept in accordance with basic security protocols.  Indeed, Marriott itself conceded that only credit card data was encrypted.[30]

---

[28] Marriott International Inc., Annual Report (Form 10-K) (Feb. 15, 2018).

[29] Alwyn Scott, Starwood, *Marriott, Hyatt, IHG hit by malware: HEI*, REUTERS, Aug. 14, 2016, https://www.reuters.com/article/us-hotels-cyber/starwood-marriott-hyatt-ihg-hit-by-malware-hei-idUSKCN10P0ZM.

[30] *See Marriott Announces Starwood Guest Reservation Database Security Incident*, MARRIOTT NEWS CENTER (Nov. 30, 2018), http://news.marriott.com/2018/11/marriott-announces-starwood-guest-reservation-database-security-incident/ (last accessed Nov. 30, 2018).

53.     Had Marriott taken appropriate security measures, the Data Breach would not have occurred.

54.     Marriott's wrongful actions, inactions, and omissions directly and proximately caused the theft of Plaintiffs and Class Members' PII, causing them to suffer, and continue to suffer, economic damages and other actual harms for which they are entitled compensation, including, *inter alia*:

   a.     actual or attempted identity theft or fraud;

   b.     increased risk of harm, including actual identity theft and fraud;

   c.     the untimely and inadequate notification of the Data Breach;

   d.     improper disclosure of their PII;

   e.     diminution in the value of their PII;

   f.     loss of privacy;

   g.     ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of identity theft, identity fraud, and medical fraud;

   h.     ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to mitigate or avert the increased risk of identity theft, identity fraud, and medical fraud; and

   i.     ascertainable losses from having paid a price premium for Defendants' services, because Defendants can charge more for those services because consumers are deceived into thinking that their PII will be adequately protected.

55.     Moreover, consumers value data security and are willing to pay more for services that come with data security.  It is for this reason that Marriott goes to such lengths to assure customers that their PII is safe.

56.     Studies confirm that "[a]mong U.S. subjects, protection against errors, improper access, and secondary use of personal information is worth US$30.49–44.62."[31]  When consumers were surveyed regarding how much they value their PII in terms of its protection against improper access and unauthorized secondary use -- the very concerns at issue here -- they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.[32]

57.     To date, Marriott has not offered Plaintiffs and Class Members any compensation from the past, present, and future harm they may experience as a result of the Data Breach.

## CLASS ACTION ALLEGATIONS

58.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated individuals within the United States (the "Nationwide Class"), defined as follows:

> All persons who reside in the United States whose PII was compromised as a result of the Data Breach.

59.     Plaintiffs Doris and Bob Lavine brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated individuals within the state of Maryland (the "Maryland Class"), defined as follows:

> All persons who reside in Maryland whose PII was compromised as
>
> a result of the Data Breach.

---

[31] *See* Il-Horn Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2002),  http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (emphasis added); Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22 (2) INFORMATION SYSTEMS RESEARCH 254, 254 (June 2011).

[32] *Id.*

60.     Plaintiff Janik brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other similarly situated individuals within the state of Illinois (the "Illinois Class"), defined as follows:

> All persons who reside in Illinois whose PII was compromised as a result of the Data Breach.

61.     Plaintiff Kelley Womack brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other similarly situated individuals within the state of California (the "California Class"), defined as follows:

> All persons who reside in California whose PII was compromised as a result of the Data Breach.

62.     Additionally, Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated individuals within certain States (the "Multi-State Class"), defined as follows:

> All persons who reside in California, Florida, Illinois, Massachusetts, Michigan, New Jersey, New York, North Carolina, Ohio, and Washington whose PII was compromised as a result of the Data Breach.

63.     Plaintiffs reserve the right to modify or amend the Class definitions before the court determines whether class certification is appropriate.

64.     Excluded from all of the above Classes are: (i) Defendant and any entities in which Defendant has a controlling interest; (ii) any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant; (iii) the Judge to whom this case is assigned and any member of the

Judge's immediate family and any other judicial officer assigned to this case; and (iv) all governmental entities.

65.     The members of the Class are so numerous that their joinder is impracticable. According to Marriott, there are hundreds of millions of Class Members.  Their identities, phone numbers, home addresses, and email addresses can be easily derived from Marriott's internal (and now external) records.

66.     The rights of the Plaintiffs and each Class Member were violated in precisely the same manner by Marriott's reckless and negligent actions, inaction, and omissions that caused the Data Breach and the unauthorized release and disclosure of their PII.

67.     There are questions of law and fact common to the Class, as a whole.  The common questions of law and fact predominate over any questions affecting only individual Members of the Class, and include, without limitation:

a.     Whether Marriott had a duty to protect the Plaintiffs and the Class Members' PII;

b.     Whether Marriott breached it duty to protect the Plaintiffs and the Class Members' PII;

c.     Whether Marriott's breach of a legal duty caused its systems to be compromised, resulting in the loss and/or potential loss of approximately 500 million individuals' PII;

d.     Whether Marriott properly designed, adopted, implemented, controlled, managed, and monitored data security processes, controls, policies, procedures and/or protocols to protect Plaintiffs and the Class Members' PII in the Data Breach;

e.     Whether Marriott failed to timely inform Plaintiffs and the Class Members of the Data Breach;

f.     Whether Marriott's conduct was willful;

g.     Whether Marriott's conduct was negligent; and

h.     Whether Plaintiffs and Class Members are entitled to damages.

19

68.     Plaintiffs' claims are typical of the claims of the Class Members because each Plaintiff, like all Class Members, is a victim of Marriott's wrongful actions, inaction, and omissions that caused the Data Breach, caused the unauthorized release and disclosure of their PII. Plaintiffs and their counsel will fairly and adequately represent the interests of the Class Members. Plaintiffs have no interests antagonistic to, or in conflict with, other Class Members' interests. Plaintiffs' counsel is highly experienced in the prosecution of complex commercial litigation, consumer class actions, and data breach cases.

69.     A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy.  The substantive claims of each representative Plaintiff and the Classes are nearly identical and will require evidentiary proof of the same kind and application of the same law.  There is no plain, speedy or adequate remedy other than by maintenance of this class action.

70.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class Members number in the millions and individual joinder is impracticable.  The expense and burden of individual litigation would make it impracticable or impossible for proposed Class Members to prosecute their claims individually. Trial of Plaintiffs and the Class Members' claims is manageable.  Unless the Class is certified, Defendants will remain free to continue to engage in the wrongful conduct alleged herein without consequence.

71.     Certification of the Class, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

72.     Certification of the Class is also appropriate under FED. R. CIV. P. 23(b)(2) because Marriott has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or equitable relief with respect to the Class as a whole.

73.     Certification of the Class is also appropriate under FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class Members would create a risk of establishing incompatible standards of conduct for Marriott.

74.     Marriott's wrongful actions, inaction, and omissions are generally applicable to the Class as a whole and, therefore, Plaintiffs also seek equitable remedies for the Class.

75.     Marriott's systemic policies and practices also make injunctive relief for the Class appropriate.

76.     Absent a class action, Marriott will retain the benefits of its wrongdoing despite its serious violations of the law and infliction of economic damages, injury, and harm on Plaintiffs and Class Members.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Negligence On Behalf Of The Nationwide Class**

77.     Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

78.     Plaintiffs brings this claim on behalf of themselves and the Nationwide Class.

79.     Marriott had a duty to Plaintiffs and Class Members to safeguard and protect their PII.

80.     Defendants assumed a duty of care commensurate with industry standards to use reasonable means to secure and safeguard this PII, to prevent its disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems.

81.     Defendants had full knowledge about the sensitivity of Plaintiffs and Class Members' PII, the PII's value to criminals, the increasing prevalence of data breaches, as well as the type of harm to could occur if such PII was wrongfully disclosed.

82.     Defendants assumed a duty of care to use reasonable means to secure and safeguard this PII, to prevent its disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems.

83.     Defendants had a duty to use ordinary care in activities from which harm might be reasonably anticipated in connection with such highly sensitive PII data.

84.     Defendants breached their duty of care by failing to secure and safeguard the PII of Plaintiffs and Class Members.  Defendants negligently stored and/or maintained its systems.

85.     Further, Defendants, by and through their above negligent actions and/or inaction, further breached their duties to Plaintiffs and Class Members by failing to design, adopt, implement, control, manage, monitor and audit its processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiffs and Class Members' PII within its possession, custody and control.

86.     Plaintiffs and Class Members have suffered harm as a result of Defendants' negligence.  These victims' loss of control over the compromised PII subjects each of them to a greatly enhanced risk of identity theft, fraud, and myriad other types of fraud and theft stemming from either use of the compromised information, or access to their user accounts.

87.     It was reasonably foreseeable -- in that Defendants knew or should have known -- that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' PII would result in its release and disclosure to unauthorized third parties who, in turn

wrongfully used such PII, or disseminated it to other fraudsters for their wrongful use and for no lawful purpose.

88.     But for Defendants' negligent and wrongful breach of its responsibilities and duties owed to Plaintiffs and Class Members, their PII would not have been compromised.

89.     As a direct and proximate result of Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs and Class Members' PII, they have incurred (and will continue to incur) the above-referenced economic damages, and other actual injury and harm -- for which they are entitled to compensation.  Defendants' wrongful actions, inaction, and omissions constituted (and continue to constitute) common law negligence.

90.     Plaintiffs and Class Members are entitled to injunctive relief as well as actual and punitive damages.

### SECOND CAUSE OF ACTION
**Invasion of Privacy On Behalf Of The Nationwide Class**

91.      Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

92.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

93.     Plaintiffs and Class Members' PII is private information.

94.     Dissemination of Plaintiffs and Class Members' PII would be offensive to a reasonable person.

95.     The public has no legitimate interest in being apprised of Plaintiffs and Class Members' PII.

96.     Defendants' failure to safeguard and protect Plaintiffs and Class Members' PII directly and proximately resulted in unreasonable publicity to the private lives of Plaintiffs and Class Members.

97.     Plaintiffs and Class Members have a legal interest in the privacy of their PII.

98.     Defendants' failure to safeguard and protect Plaintiffs and Class Members' PII was a direct and proximate cause of the access to the PII and the obtaining of the PII as a matter of law.

99.     Defendants' failure to safeguard and protect Plaintiffs and Class Members' PII deprived Plaintiffs and Class Members of their legal interest in the privacy of that information, causing them damages.

100.    As a result of Defendants' actions and inactions resulting in Plaintiffs and Class Members' loss of privacy, Plaintiffs and Class Members were (and continue to be) injured and have suffered (and will continue to suffer) the damages described above.

### THIRD CAUSE OF ACTION
**Violation of Maryland Code Ann., Com. Law § 13-101 *et seq*. On
Behalf Of The Nationwide Class Or In The Alternative The Maryland Class**

101.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

102.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

103.    This claim is brought pursuant to the MCPA, Md. Code Ann., Com. Law ("CL") § 13-101 *et seq*.

104.    Plaintiffs and Class Members are consumers for the purposes of the MCPA.

105.    Defendants are merchants for the purposes of the MCPA.  Defendants were, at all times herein, engaged in soliciting "customer services" as that term is defined in CL § 13-101(d) by soliciting an ongoing service and data aggregation of Plaintiffs and Class Members' PII, to consumers for primarily personal use within the meanings specified in the Act.

106.     Defendants, by failing to inform consumers of their unsecure and insufficient data and information security practices, advertised, sold, serviced, and otherwise induced these customers to purchase goods and services from the Defendants.

107.     Accordingly, Defendants falsely represented the security of their customers' PII within their unprotected system and thus the overall value of their services.

108.     Furthermore, Defendants failed to timely disclose the Data Breach to Plaintiffs and Class Members. Despite being aware that the data was compromised as early as September 2018, Defendants waited to inform those affected until November 30, 2018.  Maryland law requires notification of data breaches upon identification.  **CITE**

109.     The security of Defendants' data systems was a material fact to Plaintiffs and the Classes.  Had the public known of Defendants' misrepresentations and omissions as described herein, Defendants would not have been entrusted with the PII they have since compromised.

110.     Plaintiffs and the Nationwide Class sustained (and continue to sustain) injuries and damages caused by Defendants' failure to secure their PII and then to disclose the data breach once it was identified, as described above.

111.     Accordingly, Plaintiffs, on behalf of themselves and the Nationwide Class Members, respectfully request this Court award all relevant damages for Defendants' breaches of confidence.

### FOURTH CAUSE OF ACTION
### Violation of Illinois Personal Information Protection Act,
### 815 Ill. Comp. Stat. § 530/1, *et seq.* On Behalf Of The Illinois Class

112.     Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

113.     Plaintiff Janik brings this claim on behalf of himself and the Illinois Class.

114.     This claim is brought pursuant to the IPIPA, 815 Ill. Com. St. §530/1, *et seq.*

115.     The IPIPA requires data collectors to inform Illinois citizens and state officials, in a timely fashion, when a data breach occurs.  *See* 815 Ill. Com. St. §530/1, *et seq*.

116.     Section 530/10 of the IPIPA states as follows:

> The disclosure notification shall be made in the most expedient time possible and without unreasonable delay, consistent with any measures necessary to determine the scope of the breach and restore the reasonable integrity, security, and confidentiality of the data system.

117.     Defendants are "data collectors" as defined by the IPIPA because they handle, collect, disseminate, and otherwise deal with nonpublic personal data in the normal course of their business.

118.     The Data Breach constitutes a breach of security because Defendants' lack of security measures led to the compromise of Plaintiff Janik and the Illinois Class Members' PII.

119.     Defendants thus allowed "personal information," as defined in the IPIPA, to be disclosed, leaked, accessed, viewed or otherwise misappropriated by unknown hackers.

120.     Defendants violated the IPIPA by failing to disclose the Data Breach in a timely manner.  Defendants knew of the breach since September 2018 and waited over two-and-a-half months, until November 30, 2018, to release the information to the public.

121.     The security of Defendants' data systems was a material fact to Plaintiff Janik and the Illinois Class.  Had the public known of Defendants' misrepresentations and omissions as described herein, Defendants would not have been entrusted with the PII they have since compromised.

122.     Accordingly, Plaintiff Janik, on behalf of himself and the Illinois Class Members, respectfully requests this Court award all relevant damages for Defendants' breach of the IPIPA.

## FIFTH CAUSE OF ACTION
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/1, *et seq.* On Behalf Of The Illinois Class

123.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

124.   Plaintiff Janik brings this claim on behalf of himself and the Illinois Class.

125.   This claim is brought pursuant to the ICFA, 815 Ill. Comp. Stat. § 505/1, *et seq.*

126.    Section 2 of the ICFA prohibits, inter alia, deceptive and unfair conduct, including but not limited to, false representation, false statements, and omissions.

127.   Section 2 of the ICFA provides as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission or such material fact, or the use or employment of any practice … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

128.   Under the ICFA, an unfair practice is characterized as one that (a) offends public policy or (b) is immoral, unethical, oppressive or unscrupulous.

129.   Defendants' negligence in allowing the Data Breach to occur constitutes an unfair practice in violation of ICFA.

130.   Defendants' negligence in allowing the Data Breach to occur was and is immoral, unethical, and unscrupulous.  Defendants' negligence has resulted in Plaintiff Janik and the Illinois Class Members' loss of privacy.  Plaintiff Janik and Illinois Class Members were (and continue to be) injured and have suffered (and will continue to suffer) the damages described above.

131.   Accordingly, Plaintiff Janik, on behalf of himself and the Illinois Class Members, respectfully request this Court award all relevant damages for Defendants' breach of the ICFA.

27

## SIXTH CAUSE OF ACTION
### Violation of California Business & Professions
### Code § 17200, *et seq.*, On Behalf Of The California Class

132.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

133.   Plaintiff Womack brings this claim on behalf of herself and the California Class.

134.   This claim is brought pursuant to the CUCL, California Business & Professions Code § 17200, *et seq*.

135.   As a result of their reliance on Defendants' representations and omissions, Plaintiff Womack and the California Class Members suffered an ascertainable loss due to Defendants' failure to provide adequate protection of their PII and failure to provide sufficient and timely notice or warning of the Data Breach.

136.   The CUCL prohibits acts of "unfair competition," including any "unlawful, unfair, or fraudulent business act or practice."  The CUCL also prohibits any "unfair, deceptive, untrue, or misleading advertising."

137.   Plaintiff Womack and the California Class Members are reasonable consumers who expected Defendants to adequately protect the personal information entrusted to them and that they would be informed by Defendants of potential and actual cybersecurity vulnerabilities as soon as Defendants became aware of such a threat.

138.   Defendants' acts and omissions were intended to induce Plaintiff Womack and California Class Members' reliance on Defendants' explicit and implied guarantees that their PII was secure and protected, so as to increase the number of customers and the amount they can charge for their services and, thereby, Defendants' revenues.

139.   Plaintiff Womack and the California Class Members were deceived by Defendants' failure to properly implement adequate, commercially reasonable security measures to protect their

personal information, and Defendants failure to promptly notify them of the Data Breach.

140.    As a result, Defendants' conduct constitutes "fraudulent business act[s] or practice[s]" under the CUCL.

141.    Defendants' conduct was (and continues to be) likely to deceive consumers.

142.    In failing to implement adequate security procedures and protocols to protect Plaintiff Womack and California Class Members' PII and promptly notify them of potential and actual security threats, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

143.    Defendants were under a duty to Plaintiff Womack and the California Class Members to protect their PII and promptly notify them of potential and actual security threats, and other facts alleged herein, because Defendants were in a superior position to know the specifics of a potential or actual security breach and yet concealed information known to them regarding such potential and actual security breaches that affected Plaintiff Womack and California Class Members' PII.

144.    The facts Defendants concealed from or did not disclose to Plaintiff Womack and the California Class are material in that a reasonable consumer would have considered them important in deciding to utilize Defendants' services, and thereby provide their PII, or cancel, change, or otherwise modify their account information.  Had Plaintiff Womack and the California Class Members known that Defendants failed to employ necessary and adequate protection of their PII, or that Defendants would fail to timely notify them of potential and actual security breaches, they would not have provided Defendants with their PII and they would have paid less for Defendants' services.

145.    By their conduct, Defendants have engaged in unfair competition and unlawful,

unfair, and fraudulent business practices.   Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

146.     As a direct and proximate result of Defendants' unlawful, unfair, and deceptive practices, Plaintiff Womack and the California Class have suffered and will continue to suffer actual damages.

147.     Defendants have been unjustly enriched and should be required to make restitution to Plaintiff Womack and the California Class pursuant to California Business and Professions Code §§ 17203 and 17204.

148.     Accordingly, Plaintiff Womack, on behalf of himself and the California Class Members, respectfully request this Court award all relevant damages for Defendants' breach of the CUCL.

<strong><u>SEVENTH CAUSE OF ACTION</u></strong><br><strong>Violation of California Customer Records Act, Cal. Civ.</strong><br><strong>Code § 1798.80, <em>et seq.</em>, On Behalf Of The California Class</strong>

149.     Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

150.     Plaintiff Womack brings this claim on behalf of herself and the California Class.

151.     This claim is brought pursuant to the CCRA, Cal. Civ. Code § 1798.80, *et seq*.

152.     Defendants are businesses as defined by Cal. Civ. Code § 1798.80(a).

153.     Plaintiff Womack and California Class Members are individuals as defined by Cal. Civ. Code § 1798.80(d).

154.     The PII taken in the Data Breach was "personal information" as defined by Cal. Civ. Code §§ 1798.80(e) and 198.81.5(d), which includes "information that identifies, relates to, describes, or is capable of being associated with, a particular individual, including, but not limited

to, his or her name, signature, Social Security number, physical characteristics or description,

address, telephone number, passport number, driver's license or state identification card number,

insurance policy number, education, employment, employment history, bank account number,

credit card number, debit card number, or any other financial information, medical information, or

health insurance information."

155.    The Data Breach was a "breach of the security system" used by Defendants, as

defined by Cal. Civ. Code § 1798.82(g).

156.    By failing to implement reasonable security measures appropriate to the nature of

the Plaintiff Womack and California Class Members' PII, Defendants violated Cal. Civ. Code §

1798.81.5.

157.    By failing to promptly notify Plaintiff Womack and California Class Members that

their PII had been acquired or may have been acquired by unauthorized persons as a result of the

Data Breach, Defendants violated Cal. Civ. Code § 1798.82.   Defendants' failure to promptly

notify Plaintiff Womack and California Class Members of the Data Breach caused them to suffer

damages for the reasons stated above, including because they have lost the opportunity to

immediately take preventative and remedial steps to protect themselves and recover from identity

theft and fraud.

158.    Because they violated Cal. Civ. Code §§ 1798.81.5 and 1798.82, Defendants "may

be enjoined" under Cal. Civ. Code § 1798.84(e).

159.    Plaintiff Womack, on behalf of herself and the California Class, requests that the

Court enter an injunction in accordance with the relief requested below.

160.    As a result of Defendants' violation of Cal. Civ. Code § 1798.81.5, Plaintiffs and

California Class Members have incurred and will incur damages, including but not limited to:

a.  Loss of the opportunity to control how their PII is used;

b.  Diminution in the value and/or use of their PII;

c.  Compromise, publication, and/or theft of their PII;

d.  Out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of financial and medical accounts;

e.  Lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from the misuse of their PII;

f.  Costs associated with the ability to use credit and assets frozen or flagged due to credit misuse;

g.  Unauthorized use of compromised PII to open new financial and/or health care or medical accounts;

h.  Tax fraud and/or other unauthorized charges to financial, health care, or medical accounts and associated lack of access to funds;

i.  Continued risk to their PII, which remain in Defendants' possession and are subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect such PII; and

j.  Future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised in the Data Breach for the remainder of their lives.

161.    Accordingly, Plaintiff Womack, on behalf of herself and the California Class Members, respectfully request this Court award all relevant damages for Defendants' breach of the CCRA.

### EIGHTH CAUSE OF ACTION
**Deceptive Acts and Practices in Violation of the**
**Consumers Legal Remedies Act On Behalf of the California Class**

162.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

163.    Plaintiff Womack brings this claim on behalf of herself and the California Class.

164.    This cause of action is brought pursuant to the CLRA, Cal. Civ. Code §§ 1750-1785.

165.    Plaintiff Womack and California Class Members are "consumers," as the term is

defined by California Civil Code § 1761(d), because they used the Marriott reservation services for personal or family purposes.

166.    Plaintiff Womack and California Class Members, and Defendants have engaged in "transactions," as that term is defined by California Civil Code §1761(e).

167.    The conduct alleged in this Complaint constitutes deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of services to consumers.

168.    As alleged more fully above, Defendants have violated the CLRA by falsely representing to Plaintiff Womack and the California Class that their PII was secure.

169.    As a result of engaging in such conduct, Defendants have violated California Civil Code §§ 1770(a)(4) and 1770(a)(8).

170.    Pursuant to California Civil Code § 1780(a) and (e), Plaintiff Womack and California Class Members seek: (1) an order enjoining Defendants' unlawful business practices as alleged herein; (2) actual damages; (3) restitution; (4) ancillary relief; and (5) attorneys' fees and costs to the full extent allowed by law.

171.    Plaintiff Womack and the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

172.    The unfair and deceptive acts and practices of Defendants, as described above, present a serious threat to Plaintiffs and the California Class.

173.    Defendants have engaged in business practices in violation of the CLRA by false and deceptive representations concerning the safety of guests PII.  These business practices are misleading and should be enjoined.

174.    Accordingly, Plaintiff Womack, on behalf of herself and the California Class,

requests that the Court enter an injunction in accordance with the relief requested below.

## NINTH CAUSE OF ACTION
### Violation Of Materially Identical State Consumer
### Protection Statutes On Behalf Of The Multi-State Class

175.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

176.    Defendants are engaged in "trade" and "commerce" as they market and provide accommodations at their hotels and lodgings to consumers.

177.    Defendants' false representations regarding the security measures they use to protect consumers' PII was material to a reasonable consumer and likely to affect consumer decisions and conduct.

178.    Defendants have used and employed unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

179.    Defendants' acts and practices are immoral, unethical, oppressive and unscrupulous.

180.    Defendants' conduct is substantially injurious to consumers.  Such conduct has, and continues to cause, substantial injury to consumers because consumers would not have provided Defendants with their PII had Defendants not made false representations as to its data security measures.  Consumers were thus injured when Defendants allowed their PII to be stolen by cybercriminals in the Data Breach and such injury is not outweighed by any countervailing benefits to consumers or competition.

181.    No benefit to consumers or competition results from Defendants' conduct.  Since reasonable consumers are deceived by Defendants' representations of their data security and they were injured as a result, consumers could not have reasonably avoided such injury.

182.     The foregoing unfair and deceptive practices directly, foreseeably and proximately caused Plaintiffs and the Multi-State Class to suffer an ascertainable loss when Defendants allowed their PII to be stolen by cybercriminals.

183.     The practices discussed above all constitute unfair competition or unfair, unconscionable, deceptive, or unlawful acts or business practices in violation of at least the following state consumer protection statutes:[33]

   a.  **California Consumer Legal Remedies Act,** Cal. Civ. Code § 1750, *et seq.,*

   b.  **California Unfair Competition Law,** Cal. Bus. & Prof. Code § 17200, *et seq.*;

   c.  **Florida Deceptive and Unfair Trade Practices Act,** Fla. Stat. § 501.201, *et seq.*;

   d.  **Illinois Consumer Fraud and Deceptive Business Practices Act**, 815 Ill. Comp. Stat. § 505/1, *et seq.*;

   e.  **Maryland Consumer Protection Act,** Md. Code Ann., Com. Law § 13-101 *et seq.*;[34]

   f.  **Massachusetts Regulation of Business Practices for Consumers' Protection Act**, Mass. Gen. Laws Ann. ch. 93A, § 1 *et seq.*;

   g.  **Michigan Consumer Protection Act,** Mich. Comp. Laws § 445.901 *et seq.*;

   h.  **New Jersey Consumer Fraud Act**, N.J. Stat. Ann. § 56:8-1, *et seq.*;

   i.  **New York Deceptive Acts and Practices Act**, N.Y. Gen. Bus. Law § 349, *et seq.*;

   j.  **North Carolina Unfair and Deceptive Trade Practices Act,** N.C. Gen. Stat. § 75-1.1(a).

   k.  **Ohio's Consumers Sales Practice Act,** Ohio Revised Code § 1345, *et seq.*

   l.  **Washington Consumer Protection Act**, Wash. Rev. Code § 19.86.010, *et seq.*;

---

[33] There is no material conflict between these state statutes because these state statutes (1) do not require reliance by unnamed class members; (2) do not require scienter; and (3) allow class actions.

[34] To the extent the MCPA requires scienter, there is no material conflict between it and the aforementioned state statutes because scienter can be proven based on Defendants' conduct.

184.     The foregoing unfair and deceptive practices directly, foreseeably and proximately

caused Plaintiffs and the Multi-State Class to suffer an ascertainable loss when their PII was stolen.

185.     Accordingly, Plaintiffs on behalf of themselves and the Multi-State Class Members,

respectfully request this Court award all relevant damages for Defendants' breach of the consumer

protection laws listed herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Classes pray for judgment as follows:

A.     For an Order certifying the proposed Classes pursuant to FED. R. CIV. P. 23(b)(1),

(2) and/or (3), appointing Plaintiffs as Class Representative for each Class, and appointing

Daniel S. Robinson of Robinson Calcagnie, Inc. and Greg Blankinship of Finkelstein,

Blankinship, Frei-Pearson & Garber, LLP as Class Counsel;

B.     For appropriate injunctive relief and declaratory relief, including an order requiring

Defendants to immediately secure and fully encrypt all confidential information, to properly

secure computers containing confidential information, to cease negligently storing, handling, and

securing confidential information, and to provide identity theft monitoring for an additional five

years;

C.     Adjudging and decreeing that Defendants have engaged in the conduct alleged

herein;

D.     For compensatory and general damages according to proof on certain causes of

action, as well as injunctive relief, and statutory, actual, and other applicable damages, including

punitive damages;

E.     For reimbursement, restitution and disgorgement on certain causes of action;

F.      For both pre- and post-judgment interest at the maximum allowable rate on any amounts awarded;

G.      For costs of the proceedings herein;

H.      For an Order awarding Plaintiffs and the Classes reasonable attorneys' fees and expenses for the costs of this suit; and

I.      For any and all such other and further relief that this Court may deem just and proper, including but not limited to punitive or exemplary damages.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury of all claims and causes of action in this lawsuit to which they are so entitled.

Dated: December 7, 2018

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

By:      */s/ Jay P. Holland*
         Jay P. Holland (Bar No. 06015)
         Timothy F. Maloney (Bar No. 03381)
         Steven M. Pavsner (Bar No. 01353)
         6404 Ivy Lane, Suite 400
         Greenbelt, MD 20770
         Telephone: (301) 220-2200
         Fax: (301) 220-1214
         jholland@jgllaw.com
         tmaloney@jgllaw.com
         spavsner@jgllaw.com

LAW OFFICES OF PETER G. ANGELOS, P.C.

         */s/ Jay D. Miller*
         Jay D. Miller (Bar No. 04653)
         Craig M. Silverman (Bar No. 16898
         One Charles Center
         100 N. Charles Street, 20th Floor
         Baltimore, MD 21201

Telephone: (410) 649-2000
Fax: (410) 649-2101
jmiller@lawpga.com
csilverman@lawpga.com

Daniel S. Robinson
(*pro hac vice forthcoming*)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone: (949) 720-1288
Fax: (949) 720-1292
drobinson@robinsonfirm.com

D. Greg Blankinship
(*pro hac vice forthcoming*)
Jeremiah Frei-Pearson
(*pro hac vice forthcoming*)
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP.**
445 Hamilton Ave, Suite 605
White Plains, New York 10601
Telephone:  (914) 298-3281
Fax:  (914) 908-6709
gblankinship@fbfglaw.com
jfrei-pearson@fbfglaw.com

*Counsel for Plaintiff and the Classes*